UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| ALFRED W. COMER, JR., Plaintiff, v. LIAW, et al., Defendants. | CAUSE NO. 3:26-CV-933-CCB-SJF |

**OPINION AND ORDER**

Alfred W. Comer, Jr., a prisoner without a lawyer, filed a complaint against five defendants alleging they were deliberately indifferent to his serious medical needs because they refused to give him an antibiotic prescribed by a hospital doctor to treat a urinary tract infection. ECF 1, 5. The court screened Comer's complaint and granted him leave to proceed against (1) the Warden of Westville Correctional Facility in his official capacity on a claim for permanent injunctive relief in the form of ensuring that Comer is provided with constitutionally adequate medical treatment for his urinary tract infection; and (2) Dr. Liaw and Medical Provider Barlow in their individual capacities for compensatory and punitive damages for being deliberately indifferent to his serious medical condition by refusing to prescribe an antibiotic to treat his urinary tract infection in June 2026, knowing that he had a urinary tract infection and that another medical provider believed an antibiotic was needed, in violation of the Eighth Amendment. ECF 5 at 7.

Comer also filed an emergency motion for a preliminary injunction asking the court to order the defendants to provide him with an antibiotic for his urinary tract infection. ECF 3, 5. The court took the motion under advisement and ordered the Warden of Westville Correctional Facility to file and serve a response to the motion. ECF 5 at 8. The Warden has filed a response. ECF 13. Comer also filed a response (ECF 14) and two replies (ECF 15, 16). Thus, the motion is fully briefed.

Furthermore, Comer recently filed a motion asking the court to order the defendant to give him a urine culture test. ECF 26.

## BACKGROUND

Comer is incarcerated at Westville Correctional Facility ("WCF"). ECF 13-1 ¶ 6. He has a history of neurogenic bladder.[1] *Id*. ¶ 7. His medical records indicate the onset date of his condition was August 30, 2011. *Id*.

On May 12, 2026, Comer had a consultation with Dr. James Jackson, an outside urologist. *Id*. ¶ 8. He reviewed Comer's medications and vital signs but did not provide any new orders or make additional recommendations for his care. *Id*. The return note indicated Comer was ambulatory and in stable condition. *Id*. On May 13, 2026, Comer was given a box of size 14 French straight catheters for self-catheterization. *Id*. ¶ 9. Five days later, on May 18, 2026, WCF medical staff saw Comer to follow-up on his May 12, 2026, urology appointment. *Id*. ¶ 10. Because Comer reported minor burning when he

[1] A neurogenic bladder "refers to what happens when an injury or disease interrupts the electrical signals between [the] nervous system and bladder function.. . . Treatment options include lifestyle changes, catheters and medications." *See* https://my.clevelandclinic.org/health/diseases/15133-neurogenic-bladder (last visited Aug. 31, 2026).

urinated, medical staff ordered a urinalysis and urine culture. *Id*. At that time, WCF medical staff had not yet received Dr. Jackson's medical note. *Id*. ¶ 11.

On June 5, 2026, Comer was seen for a wellness check related to his urinary issues. *Id*. ¶ 12. His vital signs were taken, and he reported a pain level of zero. *Id*. He stated he felt fine but would let medical staff know if he started to "feel bad." *Id*. ¶ 13. Nurse Practitioner Erica Crittendon noted that, if Comer began to feel sick, he would be admitted to the infirmary and given intravenous antibiotics. *Id*. Comer was ambulatory and in stable condition at the time of the visit. *Id*.

On June 11, 2026, at about 3:40 a.m., Comer presented to WCF medical staff and reported he was unable to urinate or self-catheterize. *Id*. ¶ 14. At that time, he indicated his pain was a ten on a scale of one to ten. *Id*. Medical staff provided Comer with a size 12 French catheter to allow him to self-catheterize, performed a bladder scan, and also attempted onsite catheterization. *Id*. ¶ 15. Comer was unable to straight catheterize and medical staff attempted to use sizes 12 and 14 French catheters, but their attempts were unsuccessful. *Id*. ¶ 16. Comer's bladder scan indicated he had in excess of 599 milliliters of urine in his bladder. *Id*. Because Comer could not self-catheterize and attempts for onsite catheterization were unsuccessful, custody staff arranged for Comer to be transported to Franciscan Health's Emergency Department. *Id*. ¶ 17.

At Franciscan Health, medical staff evaluated Comer for urinary retention. *Id*. ¶ 18. Medical staff performed a urinalysis with reflex microscopy and bladder scan. *Id*. ¶ 19. Comer was diagnosed with acute on chronic urinary retention and a urinary tract infection, and given one gram of an intravenous antibiotic called Ceftriaxone. *Id*. ¶¶ 18,

19. He was then discharged from Franciscan Health and instructed to follow-up with an outside urologist. *Id*. ¶ 20.

On the morning of June 11, 2026, Comer returned to WCF and was evaluated by medical staff. *Id*. ¶ 21. At that time, he had a Foley catheter and leg bag[2] from the hospital. *Id*. Medical staff noted Comer had a urinary tract infection and the hospital doctor had prescribed Keflex to treat it. *Id*. at ¶ 22. Because Comer required follow-up care, Dr. Liaw saw him in WCF's urgent care unit that morning. *Id*. Medical staff noted that Dr. Liaw indicated Comer needed size 16 French catheters and they were waiting for lab results from Franciscan Health. *Id*. ¶ 23. Comer was instructed to increase his fluids and notify medical staff, if he had any concerns. *Id*. ¶ 24. He was released to his dorm in stable condition and given a temporary lay-in no-work order for two days due to his urinary condition. *Id*. ¶ 25.

Dr. Liaw also entered a provider note after Comer returned from Franciscan Health. *Id*. ¶ 26. Dr. Liaw noted that, while Comer had returned from the hospital with an order for Keflex, he typically had more resistant urinary infections than Keflex is able to treat. *Id*. ¶ 28. Dr. Liaw further noted that Nurse Practitioner Crittendon had recently submitted a urine culture and request for a virtual consultation to review the findings from her workup to determine the appropriate course of treatment for Comer. *Id*. ¶ 29.

---

[2] "A Foley catheter is a [medical] device that drains urine . . . from [the] urinary bladder into a collection bag outside of [the] body when [an individual] can't [urinate] on [their] own or for various medical reasons." *See* https://my.clevelandclinic.org/health/treatments/foley-catheter (last visited Aug. 31, 2026).

On June 12, 2026, Dr. Liaw submitted an urgent request for an outside urology follow-up appointment. *Id.* ¶ 30. Dr. Liaw's request noted Comer had an established neurogenic bladder, frequent urinary tract infections, and self-catheterizes. *Id.* ¶ 31. It also documented Comer's recent episode of urinary retention and hospitalization on June 11, 2026. *Id.*

On June 30, 2026, Comer was evaluated by Dr. David M. Kraklau, an outside urologist. *Id.* ¶ 33. Dr. Kraklau noted he was seeing Comer as a follow-up to his recent emergency department visit at Franciscan Health where he was diagnosed with a urinary tract infection and had a Foley catheter placed in his bladder. *Id.* ¶ 34. His urology note documented Comer had been unable to urinate, his urine was turbid, and the emergency department nurse was able to place the catheter with difficulty. *Id.* Dr. Kraklau indicated Comer reported self-catheterizing five times a day, had sufficient catheter supplies, and was eager to have the Foley catheter removed. *Id.* ¶ 35. Dr. Kraklau assessed Comer's condition and found he did not have a fever, chills, sweats, fatigue, weakness, decreased activity, shortness of breath, chest pain, nausea, vomiting, diarrhea, abdominal pain, headache, confusion, numbness, or tingling. *Id.* ¶ 36. A physical exam indicated Comer was in no acute distress, awake, conversant, alert and oriented, and without apparent focal deficits. *Id.* ¶ 37. Dr. Kraklau diagnosed him with urinary retention and neurogenic bladder, and recommended he continue with a regimen of five daily self-catheterizations. *Id.* Dr. Kraklau noted Comer had incidences of malodorous and turbid urine and he had about five urinary tract infections per year. *Id.* ¶ 38. He documented Comer's history of urethral stricture and he had previously

declined consideration of formal urethroplasty and cystoscopy with urethral dilation and biopsy. *Id.* ¶ 39.

When Comer returned to WCF from his urology appointment with Dr. Kraklau, the return note indicated his Foley catheter and bag had been removed and he had been advised to use a larger size catheter. *Id.* ¶ 40. His vital signs had been recorded and his pain level was documented as being zero. *Id.* Comer returned to his dorm ambulatory and in stable condition. *Id.* ¶ 41.

On July 6, 2026, Dr. Liaw saw Comer to follow-up on his recent appointment with Dr. Kraklau. *Id.* ¶ 43. Dr. Liaw checked Comer's vital signs and noted that his respiratory exam was normal. *Id.* Comer indicated he was using size 16 French catheters and self-catheterizing about six times a day. *Id.* ¶ 44. He was upset because he had not been given Keflex after returning from hospital. *Id.* ¶ 45. Dr. Liaw educated Comer by explaining his frequent urinary tract infections would make him resistant to Keflex, and bacteria may be present without requiring antibiotic treatment, which is referred to as colonization. *Id.* ¶¶ 46, 47. Dr. Liaw noted Dr. Kraklau indicated there was "no current [diagnosis] but [there were] some episodes [of] turbid urine" and Dr. Kraklau had not ordered an antibiotic. *Id.* ¶ 48. Dr. Liaw further noted that Comer was able to ambulate without issues or assistance and could get in and out of a chair easily. *Id.* ¶ 49.

Following the July 6, 2026, appointment, Dr. Liaw contacted Dr. Kraklau's office regarding Comer's medication regimen and advised the office staff that Comer was not currently taking an antibiotic. *Id.* ¶ 50. The office staff discussed the distinction between

symptomatic infection and colonization and did not provide a new antibiotic order at that time. *Id.* ¶ 51.

## ANALYSIS

In his emergency motion for a preliminary injunction, Comer seeks a mandatory preliminary injunction requiring that the defendants provide him with an antibiotic to treat his urinary tract infection. ECF 3. He asserts WCF medical staff failed to provide him with Keflex which was ordered by the hospital doctor. Thus, he asks the court to provide him with constitutionally adequate medical treatment for his urinary tract infection.

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original). A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

As to the first prong, "the applicant need not show that [he] definitely will win the case." *Illinois Republican Party v. Pritzker*, 973 F.3d 760, 763 (7th Cir. 2020). However, "a mere possibility of success is not enough." *Id.* at 762. "A strong showing . . . normally includes a demonstration of how the applicant proposes to prove the key elements of [his] case." *Id.* at 763 (quotation marks omitted). In assessing the merits, the court does not simply "accept [the plaintiff's] allegations as true" or "give him the benefit of all

reasonable inferences in his favor, as would be the case in evaluating a motion to dismiss on the pleadings." *Doe v. Univ. of S. Indiana*, 43 F.4th 784, 791 (7th Cir. 2022). Instead, the court must make an assessment of the merits as "they are likely to be decided after more complete discovery and litigation." *Id.*

As to the second prong, "[i]ssuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with . . . injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22. Mandatory preliminary injunctions—"those requiring an affirmative act by the defendant"—are "cautiously viewed and sparingly issued." *Mays v. Dart*, 974 F.3d 810, 818 (7th Cir. 2020). Additionally, in the prison-context, the court's ability to grant injunctive relief is limited. "[I]njunctive relief to remedy unconstitutional prison conditions must be narrowly drawn, extend no further than necessary to remedy the constitutional violation, and use the least intrusive means to correct the violation of the federal right." *Westefer v. Neal*, 682 F.3d 679, 681 (7th Cir. 2012) (citation and internal quotation marks omitted); *see also Rasho v. Jeffreys*, 22 F.4th 703, 711-13 (7th Cir. 2022) (outlining strict limitations on granting injunctive relief in correctional setting).

Because Comer's claim relates to the denial of medical care, it is governed by the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To prove a violation of this right, Comer must show (1) he had an objectively serious medical need and (2) the defendant acted with deliberate indifference to that medical need. *Id*. A medical need is "serious" if it is one that a physician has diagnosed as mandating treatment, or one that

is so obvious even a lay person would recognize as needing medical attention. *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005). As to the second prong, the inmate must demonstrate "a culpability standard akin to criminal recklessness." *Thomas v. Blackard*, 2 F.4th 716, 722 (7th Cir. 2021). Inmates are "not entitled to demand specific care," *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 965 (7th Cir. 2019), nor are they entitled to "the best care possible." *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997). Rather, they are entitled to "reasonable measures to meet a substantial risk of serious harm." *Forbes*, 112 F.3d at 267. The court must "defer to medical professionals' treatment decisions unless there is evidence that no minimally competent professional would have so responded under those circumstances." *Walker*, 940 F.3d at 965 (citation and quotation marks omitted). In plain terms, the Eighth Amendment protects prisoners from "grossly inadequate medical care." *Gabb v. Wexford Health Sources, Inc.*, 945 F.3d 1027, 1033 (7th Cir. 2019).

The record before the court shows that Comer suffers from a serious medical condition for which he has received a significant amount of medical care. He has a long documented history of treatment for chronic urinary tract infections and neurogenic bladder, has had prior urinary tract infections treated with antibiotics (*see* ECF 1 at 2), saw Dr. Jackson on May 12, 2026, was evaluated by WCF medical staff on June 5, 2026, and had a urine culture ordered. When Comer reported he could not urinate on June 11, 2026, WCF medical staff responded to him by attempting onsite catheterization and performing a bladder scan. Because onsite catheterization attempts were unsuccessful, custody staff arranged to have Comer transported to Franciscan Health's Emergency

Department. At Franciscan Health, Comer had a number of tests and was diagnosed with acute on chronic urinary retention and a urinary tract infection. He was given an intravenous antibiotic and discharged with instructions to follow-up with an outside urologist.

When Comer returned from the hospital on June 11, 2026, he was seen by Dr. Liaw and medical staff. Dr. Liaw acknowledged that Comer had been given an order for Keflex, but documented that Comer typically had urinary tract infections that were more resistant than Keflex is able to treat. He also noted Nurse Practitioner Crittendon recently submitted a urine culture and request for virtual consultation to determine the appropriate treatment plan. On June 12, 2026, Dr. Liaw submitted an urgent request for Comer to be evaluated by an outside urologist.

The record next shows that, on June 30, 2026, Comer saw Dr. Kraklau, an outside urologist. He reviewed the medical records from Comer's recent hospital visit, assessed his condition, and completed a physical exam. Dr. Kraklau indicated Comer should continue self-catheterizing five times a day, removed his Foley catheter and bag, and diagnosed him with urinary retention and neurogenic bladder. He noted there had been some instances of turbid urine, but he did not order an antibiotic. On July 6, 2026, Dr. Liaw evaluated Comer again and noted he was upset because he had not been given Keflex after returning from the hospital. Dr. Liaw explained that Comer's frequent urinary tract infections made him resistant to Keflex and bacteria may be present without requiring antibiotic treatment. Shortly thereafter, Dr. Liaw followed-up with Dr. Kraklau's office staff to confirm that an antibiotic had not been ordered.

In sum, the record does not support Comer's claim that he is being denied medical treatment. As discussed, the record establishes that Comer has had ongoing medical treatment for his chronic urinary condition and WCF medical staff and outside providers continue to give him constitutionally adequate medical treatment.

However, Comer argues that the court should enter a mandatory preliminary injunction in this case requiring that he be given an antibiotic. ECF 3, 15. He asserts his medical treatment is not based on scientific evidence because Dr. Liaw and his other medical providers did not order a urine culture test to assess his infection. As such, his providers did not know if his urinary tract infection was a symptomatic infection or the result of colonization. Comer asserts he has burning pain when he urinates and blood in his urine, which indicates he has a symptomatic infection. Thus, Comer asserts the decision not to prescribe an antibiotic was based on pure speculation.

The record shows that Comer's medical providers considered whether antibiotic treatment was appropriate in light of his history of resistant urinary tract infections, pending urine-culture results, symptoms, outside medical provider information, and the distinction between symptomatic infection and colonization. Thus, the record establishes that the decision not to give Comer an antibiotic was a medically-informed decision.

Furthermore, Comer has not shown that his medical providers' treatment decisions were based on factors other than their medical judgment or are otherwise "blatantly inappropriate." *See Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996) ("A prisoner's dissatisfaction with a doctor's prescribed course of treatment does not give

rise to a constitutional claim unless the medical treatment is so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate the prisoner's condition.") (quotation marks and citation omitted); *Lewis v. McLean*, 941 F.3d 886, 894 (7th Cir. 2019) ("A treatment decision that's based on professional judgment cannot evince deliberate indifference.") (quotation marks and brackets omitted).

Therefore, the record does not support a finding that Comer is likely to succeed on an Eighth Amendment claim because it shows ongoing care and medical judgment regarding the appropriate course of treatment for his chronic urinary retention and urinary tract infection. He has not demonstrated a likelihood of succeeding on the merits of his claim.

Additionally, Comer has not shown that he will be irreparably harmed if he is not granted emergency relief while this case is pending. While Comer alleges his urinary tract infection could lead to sepsis or other serious harm (*see* ECF 3 at 6), he has not produced medical evidence showing that he is currently septic or has systemic symptoms, that a particular antibiotic is medically necessary, or that court intervention is needed to prevent irreparable harm. In other words, Comer must show he will likely be irreparably injured in the absence of injunctive relief and the record before the court does not support such a finding.

In conclusion, Comer has not demonstrated a likelihood of success in proving that WCF medical staff and his outside providers were deliberately indifferent to his medical needs, and he also has not demonstrated that he will suffer irreparable harm or

injury if he is not granted immediate relief before this case is resolved. Therefore, Comer is not entitled to the extraordinary remedy of a preliminary injunction.

As a final matter, Comer filed a motion asking the court to order the defendant to give him a urine culture test. ECF 26. Because Comer is receiving constitutionally adequate medical care, his motion will be denied.

For these reasons, the court:

(1) **DENIES** the plaintiff's emergency motion for a preliminary injunction (ECF 3); and

(2) **DENIES** the plaintiff's motion asking the court to order the defendant to give him a urine culture test (ECF 26).

SO ORDERED on September 8, 2026.

/s/ *Cristal C. Brisco*
CRISTAL C. BRISCO, JUDGE
UNITED STATES DISTRICT COURT